UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE No. 8:10-CR-419-T-30TGW

STEVEN H. BYLE and
JOSEPH MICHAEL COLE

_____

REPORT AND RECOMMENDATION

On May 11, 2010, law enforcement officers executed search warrants at 6630 Leeside Isle and 12719 Chicago Avenue in Hudson, Florida, during which they seized marijuana plants, plant growing equipment, documents, firearms, and ammunition. Each defendant filed a motion to suppress all evidence obtained during the searches, arguing that the search warrants are invalid because they are based on information acquired during purportedly illegal searches of their residences (Docs. 30, 35). Additionally, defendant Steven H. Byle argues that the search warrant for his residence is invalid because the search warrant affidavit contains inaccuracies and omissions. The motions were referred to me for a report and recommendation.

After conducting an evidentiary hearing on the motions, I have concluded that the search warrants are supported by probable cause, and that there is no merit to the defendants' contentions that law enforcement conducted an illegal search of either property. Moreover, although the search warrant affidavit for the Leeside Isle residence does contain inaccuracies and omissions, the search warrant is not invalid because the defendant does not show that the errors were intentional or material to a finding of probable cause. I recommend, therefore, that Defendant Byle's Motion to Suppress Evidence (Doc. 30) and Defendant Cole's Motion to Suppress Illegally Seized Evidence (Doc. 35) be denied.

I.

The defendants, Steven H. Byle and Joseph Michael Cole, were indicted on charges of conspiracy to manufacture 100 or more marijuana plants, and the manufacture and possession of, with intent to distribute, 100 or more marijuana plants (Doc. 1). Additionally, defendant Byle is charged with possession of firearms in furtherance of a drug trafficking crime (id.). Evidence supporting these charges was seized during the execution of search

warrants at 6630 Leeside Isle and 12719 Chicago Avenue, in Hudson, Florida (Gvt. Exs. 8, 9).

An evidentiary hearing was held on the defendants' motions to suppress evidence obtained as a result of these searches. Both defendants were present with their counsel. The parties called several witnesses and proffered exhibits. Additionally, both defendants testified briefly. At the hearing, the following evidence was adduced.

A. 6630 Leeside Isle

Detective James Dattoma, the lead detective in this case, has worked for the Pasco County Sheriff's Office for four years, and has been assigned to the vice narcotics unit for the past one and one-half years. In addition to narcotics training, he has been involved in more than one hundred narcotics investigations.

On the morning of May 11, 2010, Detective Dattoma went to 6630 Leeside Isle, in Hudson, in response to a tip that marijuana was possibly being cultivated at the residence. 6630 Leeside Isle is a two-story residence with an attached single car garage in the front of the home (Gvt. Ex. 1). The

garage is flanked by two pillars. Attached to the left pillar is a mailbox and a gutter down spout. The front gate is adjacent to the left side of the garage.

The front door of the residence is set back from the gate and a metal fence which form a small enclosed patio (see id., Def. Ex. 2A). There is said to be a distance of twelve feet between the front gate and the front door. Defendant Byle testified that confederate jasmine vines grow on the fence, and produce an overwhelming fragrant odor which can be detected for one hundred yards (see Def. Exs. 2A, 3A).[1]

Detective Dattoma parked to the west of 6630 Leeside Isle, which is in a cul-de-sac, and he walked up the driveway. Detective Dattoma testified that he detected what he knew, from his training and experience, to be the strong and distinct odor of marijuana near the mailbox. Detective Dattoma testified that he believed the odor of marijuana was coming from the residence because he did not detect it until he approached the residence.

---

[1] Defendant Byle's photographs of his residence (Def. Exs. 2A, 3A) show thick bushes growing on the fence and the flowers in bloom. The detectives uniformly testified that the bushes depicted in the defense's photographs of the residence, purportedly taken a few days after the search, appeared fuller than on the day of the search. Further, none of the detectives testified to recalling a fragrant odor from the bushes.

Assisting Detective Dattoma with this investigation were Detectives John J. Sharp, Jr., Will Ferguson, Mark Erickson, and David Scott Grant, with Grant's K-9, Missy (see Gvt. Ex. 6). Detective Sharp has been employed with the Pasco County Sheriff's Office for more than ten years, and has been assigned to vice narcotics for more than five of those years. Detective Sharp has participated in thousands of narcotics investigations, more than one hundred of which involved marijuana grow houses.

Detective Sharp testified that, as he walked up the driveway of the Leeside Isle residence, he detected what he knew, from his training and experience, to be the strong odor of live marijuana. Detective Sharp noticed the front door of the residence was open, and he saw a white male, later identified as defendant Byle, exit the front door of the residence and walk toward the gate. As they stood on opposite sides of the gate, Detective Sharp identified himself, and told Byle that there was a complaint of a possible marijuana grow operation at his residence. Detective Sharp stated that Byle froze. Detective Sharp asked Byle for permission to search his home, but Byle did not answer. Rather, Detective Sharp stated that Byle locked the gate, told him to have a "good night," and walked back into his residence and

closed the door.  Detective Sharp added that the smell of the marijuana was so strong that it had to be coming from the residence.

Detective Grant has been employed with the Pasco County Sheriff's Office as a K-9 handler since 1990.  Detective Grant has been involved in thousands of narcotics investigations, hundreds of which involved marijuana grow houses.

Detective Grant has worked with K-9 Missy for two and one-half years.  She is trained to detect narcotics odors, and to disregard masking odors.  When she detects a narcotics odor, Missy gives a passive response, meaning she sits or lies down where she detects the greatest narcotics odor. She is certified on an annual basis, and undergoes training at least monthly. Missy scored one hundred percent at her last certification and, to Detective Grant's knowledge, she has never missed a problem during her certifications. Further, Missy has located controlled substances, including marijuana, on many occasions since being placed into service (see Gvt. Ex. 6).  Detective Grant characterized her as the best of the four K-9s with whom he has worked.

-6-

On the morning of May 11, 2010, Detective Grant parked his vehicle outside of the Leeside Isle cul-de-sac. He was asked to have Missy sniff around several houses in the area. In this regard, Detective Grant explained that he takes the K-9 to accessible areas around the homes, as close to the house as possible, and she sniffs the houses. Detective Grant stated that he was not told which house was under investigation to remove the possibility of tainting Missy.

Detective Grant stated that he initially took Missy to the residence to the right of 6630 Leeside Isle, but she pulled him away from that house, and up the driveway of 6630 Leeside Isle. Detective Grant testified that Missy gave a passive response for narcotic odor underneath the mailbox, which is between the front gate and garage (see Def. Ex. 1AA).

Further, Detective Grant testified that, when the front door of the residence opened, he detected what he knew to be the distinct and unique odor of marijuana. He removed Missy to the patrol car for her safety, and when he returned to the residence the marijuana smell was "very prevalent."

Detective Ferguson has been employed with the Pasco County Sheriff's Office for seven and one-half years, and has worked in the vice

narcotics unit for two and one-half years.   Detective Ferguson has participated in more than two hundred narcotics investigations, fifty of which involved marijuana grow houses. Detective Ferguson stated that the odor of marijuana can emit from anywhere in the residence. He testified that, when he walked to the front of the Leeside Isle residence, he could smell by the garage what he recognized, through his training and experience, as marijuana.

Detective Jay Scott and Sergeant Luby Fields of the Pasco County Sheriff's Office also testified at the hearing.   However, neither Detective Scott nor Sergeant Fields was present at the Leeside Isle residence. Thus, Detective Scott stated that he was three or four homes away and, consequently, he did not see anyone go inside the gate of the residence, or smell anything at the residence. Detective Scott testified that he told Sergeant Fields that the detectives were trying to make contact with Byle, and that Byle went inside the home.

Sergeant Fields testified that he had been advised by Detective Scott that Detective Dattoma was applying for a search warrant, and that the detectives had made contact with Byle, but that Byle had returned inside the home. Sergeant Fields agreed that he stated in a police report (which was not

-8-

entered into evidence) that he had been advised that Byle did not respond to knocks on the front door, but that he does not know if any detective knocked on the front door because he was not present at the residence.

In this regard, Detective Dattoma specified that, prior to obtaining the search warrant, none of the detectives tried to open the front gate of the residence. Detectives Sharp and Grant similarly testified that they did not see anyone enter the gate prior to the search warrant. Moreover, Detective Grant affirmed that Missy did not go through the gate, either.

Detective Dattoma wrote the search warrant affidavit for Leeside Isle, asserting that there was probable cause to believe marijuana and/or materials related to the cultivation or manufacture of a controlled substance were located in the residence (Gvt. Ex. 6). In support of the search warrant, Detective Dattoma stated that Missy alerted for the smell of narcotics at the front door, that the detectives smelled an odor of marijuana emitting from the front door area of the residence, and that the residence was using approximately two times the monthly kilowatt hours of comparison residences, which Detective Dattoma stated in his experience could be due to

additional electricity necessary to create the ideal environment for indoor cultivation of marijuana.

With regard to the electrical usage, Detective Dattoma testified that he obtained electricity usage histories of the Leeside Isle house and two similar size homes in the area from David Gonzalez, an employee with the Withalacoochee Electric Cooperative ("WEC").   Gonzalez testified at the hearing that law enforcement provides him with one or multiple addresses, and he provides a thirteen-month history of the electricity consumption.   He added that there are many factors that determine energy usage, and that high electricity usage could indicate illegal activity.   Gonzalez also stated that marijuana grow houses are a serious problem for the electric company.

The search warrant for the Leeside Isle residence was executed on May 11, 2010 (Gvt. Ex. 8).   During the search, detectives discovered a marijuana grow system in two bedrooms.   Thus, detectives found marijuana plants, potting soil, irrigation systems, pots, and scales.   A total of ninety-two marijuana plants were discovered, in addition to twenty-four cut marijuana plants.

.

Further, there was a vehicle in the garage, a Dodge Durango, which contained a handgun and a set of keys marked "Chicago."   The detectives also found in the garage ammunition, multiple door openers, and documents. including hydroponics store bills, printouts for marijuana seeds to purchase, and a WEC electricity bill with an address of 12719 Chicago Avenue (see Gvt. Ex. 7). Detective Ferguson testified that the electricity bill showed high electricity usage considering the small square footage of that home.

B.  12719 Chicago Avenue

Based on evidence gathered at the Leeside Isle address, Detective Ferguson suspected that 12719 Chicago Avenue was a marijuana grow house.  Consequently, Detective Ferguson directed Detectives Jones, Grant and Sharp to the residence.

Detective Sharp stated that in the front of the Chicago Avenue residence there was a fence and a gate (Gvt. Ex. 4). Detective Sharp testified that the gate was open a couple of feet, just enough for a person to walk through. The house was visible from the gate, and Detective Sharp stated that he walked through the open gate and up the long, dirt driveway to the house.

Detective Sharp stated that he knocked on the front door several times, but that there was no response. He testified that he smelled a strong odor of marijuana at the front door.

Detective Grant testified that when he arrived at the residence, the gate was open sufficiently for him and Missy to walk through, but not open wide enough to drive his car through.[2] He and Missy then walked up the dirt driveway to the residence. After going from the right of the house to the left, Missy alerted to narcotic odor in the front of the residence, in the area between the front door and garage door. Detective Grant testified that he smelled the odor of marijuana.

Detective Ferguson stated that he went to the residence after receiving a call from Detective Jones, who stated that he had smelled marijuana, and that the dog had alerted at the residence. Detective Ferguson stated that he smelled marijuana at the front door of the residence.

Defendant Cole testified that the gate was closed that day because he had latched the gate as he left the residence for a couple of days. In this regard, Cole testified that the entry gate has a latch, and in order to

---

[2] The gate is wide enough to admit a vehicle when it is open (see Gvt. Exs. 4, 5).

open the gate, the latch had to be lifted from inside of the gate, and a pole moved. Cole added that he had not given anyone permission to unlatch the gate, and that, other than the pizza delivery man, whom he meets at the gate, no one else visited the property.

Detective Ferguson wrote the search warrant affidavit for the Chicago location (Gvt. Ex. 7). In the affidavit, Detective Ferguson stated that there was probable cause to believe that there was marijuana and/or evidence related to the cultivation or manufacture of a controlled substance inside the residence based on the detectives' detection of the odor of marijuana emitting from the front door area as they approached the residence, Missy's alert to the front door for the odor of narcotics, electricity usage two to three times the monthly kilowatt hours of two other residences in the area with similar square footage, and reflective coating on the windows, which is used by marijuana cultivators to avoid detection (id.). The search warrant affidavit also included the circumstances at the Leeside Isle residence which led Detective Ferguson to suspect that the Chicago Avenue residence may be an indoor marijuana grow house.

After the search warrant was issued (Gvt. Ex. 9), Detective Ferguson returned to the residence and knocked on the door, but no one responded.   Detective Grant stated that they used the "Chicago" keys discovered at Leeside Isle to open a side door. They discovered a marijuana grow operation in a back room. Detective Ferguson stated that 177 marijuana plants were discovered inside the home, as well as grow equipment.

### C. Proceedings in this Court

The indictment in this case was returned on September 30, 2010 (Doc. 1). Each defendant subsequently filed a motion to suppress all items seized during the execution of the search warrants, including marijuana, growing equipment, firearms, ammunition, and paperwork (Docs. 30, 35). The defendants contend that the search warrant affidavits were based on information law enforcement acquired from illegal searches. Additionally, defendant Byle asserts that the search warrant affidavit for his residence contained inaccuracies, and omitted information, which renders the search warrant invalid.[3] The Government filed a combined response in opposition

---

[3]Additionally, each defendant asserts that he has standing to challenge the search of the other defendant's residence.   These assertions appear to lack merit since neither defendant made any showing that he has a reasonable expectation of privacy in the other's residence. United States v. Cooper, 203 F.3d 1279, 1283-85 (11th Cir. 2000). Regardless,

-14-

to the motions, arguing that the search warrants were supported by probable cause and that law enforcement did not conduct an illegal search of either residence (Doc. 41).

II.

A search warrant may be issued when a neutral issuing magistrate makes a practical and common sense decision that, based on the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois</u> v. <u>Gates</u>, 462 U.S. 213. 238 (1983). "[P]robable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." <u>Id</u>. at 232. Therefore,

> [c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.

because suppression of evidence is not warranted with regard to either residence. this is a moot issue.

United States v. Miller, 24 F.3d 1357, 1361 (11th Cir.1994). Where, as here, the search is conducted under the authority of a warrant, the defendant challenging the search bears the burden of showing that the warrant is invalid. United States v. Osborne, 630 F.2d 374, 377 (11th Cir. 1980), cert. denied, 450 U.S. 934 (1981); United States v. de la Fuente, 548 F.2d 528, 534 (5th Cir. 1977), cert. denied, 431 U.S. 932 (1977).

A. Leeside Isle

1. The search warrant affidavit established that there was more than a fair probability that contraband would be found in the Leeside Isle residence. In fact, if this search warrant affidavit had been presented to me, I would have issued the search warrant without hesitation.

Most significantly, Missy alerted to the odor of narcotics in front of the residence (Gvt. Ex. 6). In this regard, Detective Grant testified that, after arriving at the first of several houses he intended to have Missy sniff, Missy pulled him away from the first home and up the driveway of Byle's residence. Missy then alerted for the smell of narcotics under the mailbox, which is between the front gate and garage (Def. Ex. 1AA).

This alert, furthermore, was reliable. As Detective Grant testified, and is described in the search warrant affidavit, Missy is a certified narcotics canine who receives training on a monthly basis, and she has located controlled substances, including marijuana, on many occasions since being placed into service (see Gvt. Ex. 6). Missy's exemplary performance continued in this case, as she correctly detected the smell of marijuana emanating from both the Leeside Isle and Chicago Avenue residences.[4]

I give great weight to the dog sniff, and I would have authorized the search warrant on that basis alone. Thus, over the years, I have authorized dozens of search warrants based on dog sniffs and, while the dogs do not have a perfect score, they are rarely wrong. In fact, this past duty week, I authorized two more search warrants based on a positive alert for narcotics by two different dogs, and the K-9s' remarkable success rate continued, as both searches resulted in the discovery of narcotics. Case No. 8:11-MJ-1139TGW; Case No. 8:11-MJ-1136TGW (case still under seal). Significantly, the Eleventh Circuit has acknowledged the dogs' ability,

_____

[4]Furthermore, although Detective Grant did not recall the alert at the hearing, Missy also correctly alerted to the odor of narcotics from a vehicle sitting in the driveway of the Leeside Isle residence. Thus, Missy was "3 for 3" in this investigation.

stating that "[o]ur circuit has recognized that probable cause arises when a drug-trained canine alerts to drugs....This is sufficient probable cause to obtain a search warrant." United States v. Banks, 3 F.3d 399, 402 (11th Cir.1993), cert. denied, 510 U.S. 1129 (1994); see also United States v. Anderson, 367 Fed. Appx. 30, 32 (11th Cir. 2010), cert. denied, 130 S.Ct. 3530 (2010).

At the hearing, Byle's counsel attempted to discredit the dog sniff based on the location of the dog's alert, arguing that Missy should have alerted on the opposite side of the house in front of a window where a grow room was located, purportedly because the odor of marijuana would have been stronger there.

There is no evidence that the narcotics odor was in fact stronger in front of that window, or that Missy was even exposed to that side of the residence. Regardless, defense counsel's supposition regarding where Missy should have alerted is irrelevant. Thus, Missy's training and performance established her reliability. United States v. Sentovich, 677 F.2d 834, 838 n. 8 (11th Cir.1982). Moreover, Missy alerted correctly to the smell of narcotics which, as Detective Ferguson testified, does not necessarily come from a

particular spot in a home, but may generally emit from the residence. Therefore, counsel's speculation as to the area of the Leeside Isle residence that emitted the strongest narcotics odor does not discredit Missy's correct response.

Furthermore, probable cause to search the Leeside Isle residence was buttressed by the detectives' detection of the odor of marijuana. Thus, Detectives Dattoma, Sharp, Grant, and Ferguson testified that they detected what they knew, from their law enforcement training and experience, to be the odor of marijuana at the front of the residence by the garage and front gate.[5] As the Eleventh Circuit has noted, "the recognizable smell of marijuana gives rise to probable cause...." United States v. Hamilton, 299 Fed. Appx. 878, 882 (11ᵗʰ Cir. 2008); see, e.g., United States v. Lueck, 678 F.2d 895, 903 (11ᵗʰ Cir. 1982)("At the point marijuana was smelled by Officer Helgeson, [there was] probable cause to believe a crime had been committed..."); United States v. Tobin, 923 F.2d 1506, 1512 (11ᵗʰ Cir. 1991), cert. denied, 502 U.S. 907 (1991)("There is no doubt that the agent's

---

[5] Detective Erickson, who was also present at Leeside Isle, did not testify at the hearing. However, Detective Dattoma testified that Detective Erickson had told him that he smelled marijuana, as well.

suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."). These vice narcotics detectives have received narcotics training and collectively have been involved in thousands of narcotics investigations. Therefore, they can reliably detect the odor of marijuana.

Furthermore, I find their testimony credible. Thus, the detectives testified consistently, and without equivocation, that they smelled marijuana in front of the residence. Defendant Byle, moreover, presents no probative evidence to discredit this testimony. Rather, Byle challenges the credibility of the detectives' testimony based on speculation that an overwhelming smell of confederate jasmine masked the smell of marijuana (Doc. 30, pp. 6, 20-22). The detectives, however, testified that they smelled marijuana, and did not recollect smelling jasmine. Detective Grant, in particular, stated that he knew jasmine and did not smell any jasmine.

Further, accepting that the scent of jasmine was present that day, this circumstance does not undermine the detectives' testimony that they smelled marijuana. Thus, while Byle testified that there was an overwhelming fragrant odor of jasmine that could be smelled for 100 yards,

he did not testify that the odor of marijuana was undetectable outside the house. Accordingly, this attempt at discrediting the detectives is unpersuasive.

Finally, Detective Dattoma stated in the search warrant affidavit that the Leeside Isle residence had a substantially higher electricity usage than two other residences in the area with similar square footage. In this regard, Detective Dattoma explained that, in his training and experience, measures necessary to maintain ideal temperatures for indoor cultivation of marijuana may result in high energy consumption. Gonzalez with the WEC affirmed that high electricity usage may be connected with illegal activity. Under the totality of the circumstances, the electricity usage provides some corroboration for the detective's belief that there was a grow house inside the residence. See United States v. Robinson, 62 F.3d 1325, 1331 n.10 (11th Cir. 1995), cert. denied, 517 U.S. 1220 (1996)("Evidence of an extremely high power bill is one factor justifying issuance of a warrant to search for indoor marijuana cultivation."). However, it is noted that the absence of this information would not have made any difference because Missy's alert for a narcotic odor, and the detectives' detection of the odor of marijuana at the

front of the residence, established probable cause that there was marijuana inside the Leeside Isle residence.

2. Byle argues that the search warrant is nonetheless invalid because the affidavit contains both information acquired during a purportedly illegal search of his property and material false statements and omissions (Doc. 30, pp. 5-10, 12-24). First, the defendant argues vaguely that law enforcement "approached the attached garage and began a general search of the curtilage" (id., pp. 14-15).[6] The detectives did not violate the Fourth Amendment when they walked up the driveway to the residence's front gate because this area does not constitute curtilage. Thus, as the photographs reflect (see Def. Ex. 1A), the detectives walked up a concrete driveway which is openly accessible to the public. The detectives' location outside of the residence's metal gate, and beside a mailbox, confirms that there was no reasonable expectation of privacy in that area. See United States v. Dunn, 480 U.S. 294, 301 (1987).

---

[6] The defendant also argues that there is no reason why law enforcement initiated an investigation of Byle (Doc. 30, p. 4). The uncontradicted testimony at the hearing was that law enforcement's investigation was precipitated by a tip that there may be a marijuana grow house at that residence.

The defendant argues further that, after making initial contact with law enforcement at his front gate, law enforcement "breached the previously locked courtyard gate and began pounding on Mr. Byle's door and windows, demanding that he come out and speak with them" (Doc. 30, pp. 7-8).[7] However, there is no probative evidence to support that assertion.

At the hearing, the detectives testified unequivocally that they walked up the driveway and remained outside the front gate before obtaining the search warrant. Further, the detectives corroborated each other's testimony, as Detective Dattoma averred that none of the officers tried to open the gate prior to obtaining the search warrant, and Detectives Sharp and Grant affirmed that they did not see any detective breach the gate. The defendant, furthermore, presents no probative evidence discrediting this testimony. Significantly, Byle testified at the hearing, but he did not offer testimony that the detectives pounded on his door and windows, or otherwise breached the gate.[8] Consequently, the defendant's contention that law

---

[7] The defendant suggests, inconsistently, in his motion that a breach of the locked gate did not occur (see Doc. 30, p. 5)(stating that "the front gate was locked and neither the K-9 nor her handler could have gotten closer than twelve feet from the front door").

[8] In fact, the only mention at the hearing of detectives knocking on the residence's front door was Sergeant Fields' affirmation that a police report he authored (and was not

enforcement conducted an illegal search of the Leeside Isle residence is meritless.

Finally, the defendant argues that the search warrant is invalid because the affidavit contained "misleading, incorrect and false assertions" and material omissions (id., p. 2). A search warrant is void under the Fourth Amendment if the affidavit supporting the warrant (1) omits information, or contains false statements, deliberately or in reckless disregard for the truth and (2) absent those misrepresentations or omissions, probable cause would have been lacking. See Franks v. Delaware, 438 U.S. 154, 171-72 (1978).

Unquestionably, the search warrant affidavit contains inaccuracies and omits descriptive information about the residence. Thus, the affidavit incorrectly states that Missy alerted to the front door for the odor of narcotics, instead of at the mailbox (see Def. Ex. 1AA). Further, the affidavit states that "[a]ll of the above Detectives" (Gvt. Ex. 6) advised that they detected the odor of marijuana, when in fact one of the listed detectives was

---

admitted in evidence) stated that he was advised detectives knocked on the front door. However, as Sergeant Fields testified, he has no personal knowledge of this information, as he was not present at the residence. This does not persuade me to discredit the testimony of several detectives who were present at the residence and stated that they did not breach the gate.

not present at the residence and, therefore, did not have an opportunity to detect any odor. Additionally, the affidavit states that the detectives smelled the marijuana odor emitting from "the front door area," when it is more accurate to state that they detected the odor by the garage and front gate. Moreover, it would have been more precise and illustrative to state in the affidavit that there was a storm door attached to the front door, and that the front door was surrounded by a patio that separated it from the front gate by an estimated twelve feet.

However, none of these inaccuracies or omissions renders the warrant invalid. First, the defendant has failed to meet his burden to show that any of the errors or omissions was made intentionally or with reckless disregard for the truth. <u>Franks</u> v. <u>Delaware</u>, <u>supra</u>, 438 U.S. at 171. In fact, there is no evidence that these errors were intended to mislead a judge, and their immateriality to the probable cause determination suggests that they were negligent or innocent mistakes. <u>See</u> <u>Madiwale</u> v. <u>Savaiko</u>, 117 F.3d 1321, 1326 (11th Cir. 1997)("Negligent or innocent mistakes do not violate the Fourth Amendment."). After all, the search warrant affidavit had to be

prepared in a hurry, since the defendant was aware of the officers' presence and could take steps to destroy evidence.

Further, it is the defendant's burden to show that, absent the misrepresentations or omissions, probable cause would have been lacking. See Franks v. Delaware, supra; United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009), cert. denied, 130 S.Ct. 1315 (2010). As the defendant acknowledges, suppression is not appropriate unless, after the court "supplement[s] the affidavit with the true facts," it determines that probable cause would not have existed (Doc. 30, p. 25); see also United States v. Kapordelis, supra, 569 F.3d at 1309-10 (noting that the district court correctly analyzed the issue by removing the tainted information and transplanting into the affidavit the alleged material omissions). The errors in this case are immaterial because, when it is accurately stated that Missy alerted for the smell of narcotics underneath the mailbox attached to the garage, and that four detectives detected the odor of marijuana by the residence's garage and front gate, there clearly remains probable cause to believe that contraband is inside the residence. Thus, if I had been presented with a search warrant affidavit that contained all of the information developed

at the evidentiary hearing, I still would not have hesitated in issuing the search warrant for 6630 Leeside Isle.

In sum, Byle's challenges to the validity of the search warrant fail. Therefore, the search of his residence was not a violation of the Fourth Amendment.

B.  12719 Chicago Avenue

The search warrant affidavit for the Chicago Avenue residence (Gvt. Ex. 7), which identified Missy's alert for narcotic smell in front of the residence, and the detectives' detection of marijuana odor in the front door area of the residence, established probable cause that marijuana would be found in the residence. The additional circumstances stated in the search warrant affidavit concerning the residence's high electricity consumption, reflective coating on the windows, and the discovery of a high electricity bill for the Chicago Avenue address and keys labeled "Chicago" inside a marijuana grow house, further corroborate the affiant's belief that contraband was in the residence.

Defendant Cole, furthermore, does not challenge that these circumstances establish probable cause. Rather, he argues that the search

warrant is invalid because it is based on information acquired during a purportedly illegal search of his residence.

Specifically, Cole asserts that the residence was beyond a closed secured gate (see Docs. 35, 63). Based upon a consideration of the evidence, however, I find that the gate was open. Consequently, the defendant's argument fails as a matter of fact.

As adduced at the hearing, prior to obtaining a search warrant, the detectives went to the Chicago Avenue residence to investigate the reasonable suspicion that it was a marijuana grow house based on their discovery inside a marijuana grow house of the Chicago Avenue's electricity bill, which showed high electricity consumption, and keys labeled "Chicago." Consequently, Detective Ferguson directed Detectives Sharp, Jones, and Grant to the residence. In this connection, Detective Sharp testified that he entered the property through a gate at the end of a driveway that was open sufficiently for a person to walk through, and, after walking up the dirt driveway to the residence, he knocked on the front door multiple times, but there was no response. Detective Grant similarly testified that, when he arrived at the residence, the gate was open sufficiently for him and Missy to

-28-

walk through, but was not open wide enough for his vehicle to pass through.
Detective Ferguson arrived afterwards. The detectives testified that they
smelled the odor of marijuana by the front door, and Detective Grant stated
Missy alerted to the smell of narcotics in the front of the residence between
the front door and the garage.

Cole disputes that the gate was open when law enforcement
arrived at his residence. In this connection, he testified that the gate was
closed because he had latched it prior to leaving the residence for a couple of
days. Furthermore, he stated that he did not authorize anyone to unlatch it,
and that no one visits the property other than the pizza delivery person, who
is met at the gate.

I find credible the testimony of Detective Sharp that the gate was
partially open. Thus, he testified that the gate was open sufficiently for a
person to walk through. His testimony in this regard was straightforward and
unequivocal. Detective Grant also testified that the gate was open enough for
him and Missy to walk through, although it is unclear whether he arrived at
the same time as Detective Sharp. Furthermore, Cole's testimony that he
closed and thought he latched the gate before leaving the residence does not

discredit the detectives' testimony because the gate could have been opened by someone else in the interim, or Cole may not have properly latched the gate.[9]

Cole emphasizes that Detective Grant's testimony is contradicted by his statement in a police report (which was not admitted into evidence) that the gate was closed.  However, Detective Grant explained, in a credible manner, that the reference to a closed gate meant the gate was not open sufficiently for a vehicle to go through.  He added that, after the search warrant was obtained, the gate was opened and he was able to drive his vehicle through.  Buttressing Detective Grant's explanation is the fact that, if, as it appears, Sharp arrived at the residence before Grant, the gate would have been open for Grant, even if the gate had initially been closed. Furthermore, law enforcement respected the gate at the Leeside Isle residence, and I have no reason to think they would not similarly respect a closed gate at the Chicago Avenue residence.  In sum, the defendant has failed to persuade me that the gate was closed.

----

[9] In this regard, I do not accept Cole's testimony that no one visits his property other than the pizza delivery man. Thus, the discovery of keys to the Chicago Avenue residence in Byle's Leeside Isle home indicates that, at least, Byle was a visitor.

In all events, the defendant's argument fails as a matter of law even if the gate had been closed. Thus, the detectives' entry onto Cole's property did not violate the Fourth Amendment because law enforcement may enter curtilage through an unlocked gate and approach the house in order to conduct a "knock and talk" with residents of the house. See United States v. Taylor, 458 F.3d at 1201, 1204 (11th Cir. 2006)(officers' warrantless entry by opening a closed gate does not violate the Fourth Amendment); Edens v. Kennedy, 112 Fed. Appx. 870, 875-76 (4th Cir. 2004), cert. denied, 543 U.S. 1153 (2005)("even within the curtilage, the police may traverse a fence if there is no clear indication that the homeowner intended to exclude uninvited visitors"); United States v. Otero, 231 Fed. Appx. 809, 809-10 (10th Cir. 2007)(police officers did not violate owner's Fourth Amendment rights by going through an unlocked gate and knocking on the door of the residence); United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006), cert. denied, 549 U.S. 956 (2006)(permissible "knock and talk" when officers entered property through an unlocked gate to ask the resident about stolen vehicles).

The Eleventh Circuit explained the "knock and talk" exception

to the Fourth Amendment's warrant requirement in <u>United States</u> v. <u>Taylor</u>,

<u>supra</u>, 458 F.3d at 1204 (citations and quotation marks omitted):

> The Fourth Amendment, which prohibits
> unreasonable searches and seizures by the
> government, is not implicated by entry upon
> private land to knock on a citizen's door for
> legitimate police purposes unconnected with a
> search of the premises....Absent express orders
> from the person in possession, an officer may walk
> up the steps and knock on the front door of any
> man's castle, with the honest intent of asking
> questions of the occupant thereof. Thus, officers
> are allowed to knock on a residence's door or
> otherwise approach the residence seeking to speak
> to the inhabitants just as any private citizen may.

<u>See also</u> <u>United States</u> v. <u>Tobin</u>, <u>supra</u>, 923 F.2d at 1511 (while reasonable

suspicion does not justify a warrantless search of a residence, it permits law

enforcement to approach a residence to ask questions.).

Cole argues that the knock and talk exception is inapplicable

here because, in order to enter the property, the detectives "opened a secured

closed gate, that encompassed the entire property" (Doc. 35, p. 8; <u>see also</u>

Doc. 63).  When an owner makes apparent an intent to exclude the public

from his property by placing a lock on the entry gate, or posting on the fence

-32-

"No Trespassing" signs or the like, the knock and talk exception is inapplicable because "the act of sealing the property creates an elevated expectation of privacy" so that the owner can reasonably expect all visitors to cease. Edens v. Kennedy, supra, 112 Fed. Appx. at 875.

Although in this case there was a fence around the property and a gate, there was no lock on the gate, or signs posted, which would suggest to an ordinary citizen that entry was prohibited. See id.; cf. United States v. Taylor, supra (law enforcement officers may approach the residence seeking to speak to the inhabitants just as any private citizen may). These circumstances unquestionably do not evince an intent to exclude the public from the property and, just as any salesperson, package delivery person, or other citizen could freely enter the property, it was permissible for law enforcement to do so. See United States v. Taylor, supra (officers' warrantless entry by affirmatively opening a closed gate does not violate the Fourth Amendment); United States v. Weston, supra, 443 F.3d at 667 (permissible "knock and talk" when officers entered property through an unlocked gate that was possibly closed to ask the resident about stolen

vehicles). Thus, as the Fourth Circuit aptly reasoned (Edens v. Kennedy,

supra, 112 Fed. Appx. at 875):

> In the absence of a fence with a locked gate, a
> homeowner is likely to receive visits from
> pollsters, door-to-door salespeople, and trick-or-
> treaters, among others. There is no constitutional
> basis for excluding police officers from this list of
> potential visitors.

In this case, it is undisputed that there was no padlock or security lock on the

gate. Rather, there was only a latch on the gate, which does not evince the

same expectation of privacy as a lock, and could be opened by anyone.[10]

Furthermore, there was no evidence of "no trespassing" signs or guard dogs.

Cole's citations to United States v. Quintana, 594 F.Supp.2d

1291 (M.D. Fla. 2009) and United States v. Hambelton, 2009 WL 722284

(N.D. Fla. 2009) do not warrant a different conclusion because those cases

are inapposite. Thus, the courts in Quintana and Hambelton rejected the

application of the knock and talk exception because law enforcement evaded

locked gates by jumping over fences onto the property. Specifically, in

Quintana, law enforcement jumped over a fence and unlocked an electronic

---

[10]Contrary to the defendant's argument, a latch is not the same as a lock. See, e.g.,
United States v. Quintana, supra, 594 F.Supp.2d at 1296 (distinguishing between a locked
gate and a gate with a "closed flip-type latch").

driveway gate. 594 F.Supp.2d at 1301. In <u>United States</u> v. <u>Hambelton</u>, <u>supra</u>, law enforcement jumped over a fence with a chainlink gate that had two padlocks and warning signs for "guard dogs." 2009 WL 722284 at ** 1, 2. Thus, not only do the locked gates evince a greater expectation of privacy than in this case, the <u>Quintana</u> and <u>Hambelton</u> courts aptly noted that law enforcement jumping over a fence is conduct that goes beyond what would reasonably be expected of a private citizen, which is contrary to the rationale underlying the knock and talk cases.

In sum, law enforcement's entry onto the property prior to obtaining the search warrant was not unlawful and, therefore, law enforcement was at a lawful vantage point when they and Missy detected narcotic odor at the residence. Consequently, Cole has not stated a basis for invalidating the warrant and suppressing evidence seized at the residence.

IV.

For these reasons, I recommend that Defendant's Motion to Suppress Evidence (Doc. 30) and Defendant's Motion to Suppress Illegally Seized Evidence (Doc. 35) be denied.

Respectfully submitted,

THOMAS G. WILSON

DATED: APRIL _15_, 2011      UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. 636(b)(1).